Samuel S. Broughton and Loretta T. Broughton v. Commissioner.
Broughton v. Comm'r
Docket No. 82690. United States Tax Court
T.C. Memo 1962-275; 1962 Tax Ct. Memo LEXIS 32; 21 T.C.M. (CCH) 1448; T.C.M. (RIA) 62275; November 21, 1962
*32 Walter J. Murray, Esq., Penobscot Bldg., Detroit, Mich., for the petitioners. Julian R. Ettelson, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in the income tax of petitioners for the taxable years 1954 and 1955 in the respective amounts of $8,643.74 and $1,764.72. The issues before us to be decided are (1) whether respondent has erred in treating gains of petitioners from the sale of real estate as ordinary income and (2) whether petitioners are entitled to deductions for business entertainment and travel expense in excess of the amounts allowed by respondent set forth in the deficiency notice. The petitioners have conceded all adjustments made by respondent in determining the deficiencies except those involved in the foregoing issues. Findings of Fact Facts which have been stipulated are so found. Petitioners Samuel S. Broughton and Loretta T. Broughton are husband and wife residing in Wyandotte, Michigan. They filed joint Federal income tax returns for the taxable years 1954 and 1955 with the district director at Detroit, Michigan. For approximately 10 years prior *33 to 1938 petitioner Samuel S. Broughton headed the Trust Department of the Wyandotte Savings Bank. In 1938 the bank discontinued its Trust Department and Broughton personally took over a substantial portion of the trust business formerly conducted by the bank. In 1939 he opened his own office for the purpose of carrying on such a business. Prior to November 3, 1939, L. F. Knowles, a real estate developer, was the owner of some 4,000 unimproved real estate lots in and around Wyandotte, Michigan. On that date the lots were sold to the State of Michigan for past due taxes. Approximately 700 of the lots which had formerly been owned by Knowles are located in Wyandotte in what is now known as the West Park Development. The West Park Development consists of four contiguous subdivisions, known as Mizner, West Park, West Park No. 1, and West Park No. 2. Those lots were to be offered for sale by the State of Michigan, beginning on February 13, 1940, for a price of not less than 25 percent of the 1938 assessed valuation thereof. Knowles, by reason of his former ownership of the property, had certain priority rights under the statute governing the sale. On or about January 27, 1940, Knowles *34 entered into an agreement with Blanche E. Van Alstyne under which Knowles was to redeem 333 1/2 lots in the West Park No. 2 Subdivision from the State of Michigan with funds to be supplied by the other parties to the agreement. The agreement, hereinafter sometimes referred to as the Knowles-Van Alstyne agreement, provided that, after completion of the purchase, Knowles was to transfer all his right, title, and interest in the property to Fred E. Van Alstyne and Samuel S. Broughton as trustees. Paragraph V of the agreement provided as follows: V. The Trustees shall offer all such properties for sale to the general public at the earliest possible date, at prices to be mutually agreed upon by Fred E. Van Alstyne and Leonard F. Knowles. To this end the Trustees shall be authorized to enter into an agreement with Samuel S. Broughton as agent to handle the sale of said properties, said agent to be required to exert diligent effort to promote the sale and disposal of said properties as rapidly as possible; the compensation of said agent for selling the properties and performing all services in relation thereto, shall not exceed fifteen per cent (15%) of the sale price of such property sold *35 through his efforts. One-half of the net profit of the venture was to be distributed to Knowles. The remainder was to be distributed to the other parties to the agreement. On April 18, 1940, Broughton, acting as "trust officer" for his wife Loretta, and Knowles entered into an agreement under which Knowles was to purchase 335 lots located in the Mizner, West Park, and West Park No. 1 Subdivisions from the State of Michigan with funds to be supplied by Broughton. Under the agreement, hereinafter sometimes referred to as the Knowles-Broughton agreement, Knowles was to hold the properties as trustee for himself and Broughton. Paragraph 4 of the agreement provided, in material part, as follows: L. F. Knowles hereby agrees that if and when he is able to make a purchase agreement with the State of Michigan, covering the aforesaid property, for a sum not to exceed 25% of the 1938 assessed valuation thereof, that upon execution of said purchase agreement, he will offer the said property for sale to the general public, at the earliest possible date, at prices and terms to be mutually agreed upon between the parties hereto. Broughton was to act as agent in selling the property and was *36 to receive a commission of 15 percent of the sale price of the property sold through his efforts. He agreed "to exert diligent effort to promote the sale and disposal of said properties as rapidly as possible." The net profits to be derived from the sale of the properties were to be divided equally between Broughton and Knowles. While arrangements were being made for the purchase of the lots covered by the Knowles-Van Alstyne and Knowles-Broughton agreements, Knowles, Broughton, and Fred E. Van Alstyne worked together to make the lots marketable and eligible for FHA financing. The lots purchased from the State pursuant to the agreements were 30 feet in width. Because of changed conditions in the new home market, 30-foot lots were no longer marketable as building sites. Accordingly, restrictions were written into the subdivision plats requiring each building lot to be of a minimum width of 45 feet. The funds which were to be advanced by Broughton under the Knowles-Broughton agreement were actually supplied by Broughton's wife Loretta, and all of the net profits later derived from the sale of properties covered by that agreement were divided equally between Knowles and Loretta. Loretta's *37 share of the proceeds was placed in a separate account in her name by Broughton acting as her "trust officer." The West Park Building Company, Inc., sometimes hereinafter referred to as the Building Company, was formed in 1942. Throughout the period 1942 through 1955, Broughton owned 97 percent of its capital stock. Practically all the lots acquired from the State of Michigan under the Knowles-Van Alstyne agreement and the Knowles-Broughton agreement and all the lots later acquired by Broughton, himself, in the West Park Development were sold to the West Park Building Company, Inc., which constructed approximately 95 percent of the houses in the development. Throughout the years 1942 through 1955, the West Park Building Company operated in the following manner: It would first select a block or cluster of lots which it desired to develop. It would then obtain architectural plans suitable to the location and advertise in the newspapers for customers. Potential customers could look over various models of homes that had already been constructed in the area by the Building Company. They would also be given a printed prospectus or brochure describing the homes and the location. *38 After obtaining a potential customer, Broughton, as sales agent for the Building Company, would attempt to interest him in a package consisting of an architectural plan and a suitable building lot. If he were successful, the customer would contract to buy a lot and a house to be constructed by the Building Company according to a plan selected by the customer. The Building Company would then purchase the chosen lot from the Knowles-Van Alstyne venture, the Knowles-Broughton venture, or Broughton, himself, as the case might be, erect a house on it in accordance with the contract with the customer, and sell the lot and completed house to the customer. The Building Company was not required to, and did not, purchase any ground before contracting with a customer to construct a house on it. After using all available building sites in the block of lots selected for development, the Building Company would move on to another block and repeat the process. The bulk of the lots in the West Park No. 2 Subdivision were sold prior to 1945. In 1945 the parties to the Knowles-Van Alstyne agreement desired to dispose of the remainder of their holdings and terminate the agreement. Accordingly, on April 11, 1945, they *39 granted Broughton an option, which he later exercised, to purchase 43 1/2 lots remaining on hand in West Park No. 2. Knowles moved permanently to Florida sometime in 1945. During the years 1941 through 1953, Broughton also acquired approximately 30 or 40 lots scattered throughout the Mizner, West Park, and West Park No. 1 Subdivisions. All the lots acquired under the Knowles-Broughton agreement were disposed of during the years 1945 through 1954. On June 26, 1945, Knowles deeded 4 lots to Loretta and took a like number himself. Loretta had commercial buildings erected on her lots and held them for rental purposes throughout the period under discussion. By August 24, 1954, all the remaining lots had been sold with the exception of 12 lots which, on that date, were equally divided between Loretta and Knowles. Loretta entered into a long-term lease with a gasoline company which constructed a gasoline station on her lots. In the years 1947 through 1954, Loretta received the following amounts as her share of the profits from the sale of lots under the Knowles-Broughton agreement: 1947
$ 3,500.00
1948
1949
5,600.00
1950
5,000.00
1951
2,000.00
1952
5,250.00
1953
10,021.00
1954
12,505.36
*40 The lots acquired by Broughton in the West Park Development were sold by him during the years 1949 through 1955. The number of sales made by him in each of those years, his gross receipts from sales, and the profits he realized were as follows: Gross
Year
Sales
Receipts
Profits
1949
6
$ 9,299.84
$ 4,758.71
1950
9
21,320.00
5,453.52
1951
14
48,245.30
6,343.50
1952
*
*
*
1953
6
14,345.00
3,982.55
1954
19
50,105.00
9,782.50
1955
13
28,600.00
3,882.50
67
$171,915.14
$34,203.28
Broughton did not exert any particular effort to sell his lots in preference to those owned by Knowles and Loretta. Nor did he purposely keep them off the market. With few exceptions, all the lots in the West Park Development, including those owned by Broughton, were sold when and as needed by the Building Company in the process of developing the area block by block. Loretta's share of the proceeds from the sale of lots acquired under the Knowles-Broughton agreement was invested in rental property, mortgages, and stocks. None was ever used to purchase additional lots. A portion of the proceeds from the sale of lots owned *41 by Broughton was used by him in the purchase of additional lots. The remainder was used to meet personal expenses. Neither Samuel nor Loretta Broughton has purchased or sold any lots since 1955. During the years 1940 through 1954, Broughton received a 15 percent commission on each lot sold under the Knowles-Van Alstyne and Knowles-Broughton agreements. While Broughton received no salary as such from the Building Company, he did receive fees from it for supervising construction. In addition, he had a sales contract with the Building Company under which he received 5 percent of all safes made by it. In the years 1954 and 1955, Broughton frequented the Grosse Ile Golf Club, the North Shore Club, and the Wyandotte Yacht Club where he upon occasion took buyers, materialmen, and contractors to lunch. In those years he paid $1,209.53 and $1,058.68, respectively, to the Grosse Ile Golf Club and $124 and $208, respectively, to the North Shore Club. In each of the years 1954 and 1955, he paid $60 to the Wyandotte Yacht Club. In 1955 Broughton made a trip east to attend a seminar in Washington at the opening of the Builders' Association's National Home Show and a meeting in New York at *42 which matters pertinent to home construction were discussed. He also made a trip to Florida in 1955 at which time he discussed certain business matters with Knowles. On the joint Federal income tax returns filed by them for the taxable years 1954 and 1955 the petitioners reported the profits realized by them in those years from the sale of lots in the West Park Development as long-term capital gains. Petitioners attached Schedule C (Profit (or Loss) From Business or Profession) to each of their 1954 and 1955 returns. In those schedules they reported the income received by Broughton in the conduct of his "Insurance, Management and Real Estate" business as follows: 1954
Real Estate Commissions: West Park Sales
$ 3,918.37
West Park Building Co.
19,850.00
General Sales
1,360.00
$25,128.37
Supervision Fees: West Park Building Co.
17,500.00
Management Fees: Mt. Carmel Cemetery
1,125.00
Estates and Trusts
414.00
1,539.00
Insurance Commissions
1,366.11
$45,533.48
1955
West Park Building Company: Commissions
$16,550.00
Supervision Fees
15,250.00
$31,800.00
Management Fees: Mt. Carmel Cemetery
1,200.00
Estates and Trusts
759.00
1,959.00
General: Real Estate Commissions
1,000.00
Supervision Fees
2,180.06
Insurance Commissions
959.37
4,139.43
$37,898.43
*43 On the Schedule C attached to their 1954 return the petitioners claimed, in addition to other expenses which are not in dispute, business promotion and entertainment expenses in the amount of $2,530.98. On the Schedule C attached to their 1955 return the petitioners claimed, in addition to other expenses which are not in dispute, business promotion and entertainment expenses in the amount of $2,057.99 and traveling and convention expenses in the amount of $750. In the statutory notice of deficiency respondent determined that the gains realized by the petitioners in the taxable years 1954 and 1955 from the sales of lots in the West Park Development are taxable in full as ordinary income. Respondent further determined that $1,930.98 of the promotion and entertainment expense deduction claimed in the 1954 return, $1,657.99 of the promotion and entertainment expense deduction claimed in the 1955 return, and $375 of the traveling and convention expense deduction claimed in the 1955 return do not constitute allowable deductions under the provisions of the Internal Revenue Code of 1954. Ultimate Findings The lots sold by petitioner Loretta T. Broughton and L. F. Knowles in the taxable *44 year 1954 were held by them primarily for sale to customers in the ordinary course of their trade or business. The lots sold by petitioner Samuel S. Broughton in the taxable years 1954 and 1955 were held by him primarily for sale to customers in the ordinary course of his trade or business. Opinion Issue 1 The primary issue presented is whether petitioners realized ordinary income or capital gains from their sales of vacant subdivided lots of real estate during 1954 and 1955. The only dispute between the parties is whether, within the meaning of section 1221(1) of the 1954 Code, the lots in question were held by petitioners primarily for sale to customers in the ordinary course of their trade or business. If the answer is affirmative, which we think it must be, respondent prevails. Petitioners contend that the moneys advanced by Loretta to enable Knowles to reacquire his lots from the State of Michigan were so advanced only as an investment; that she took no part in the subsequent sale of the lots, had no authority under the Knowles-Broughton agreement to direct the handling or management thereof, and was a mere passive lender. Respondent bases his determination that *45 Loretta, during the years at issue, was carrying on a real estate business on the theory that she was a joint adventurer with Knowles and her husband by virtue of her husband's execution of the Knowles-Broughton agreement in her behalf and his own and the ensuing sales of lots in pursuance thereof; that even though Loretta may have been passive personally with respect to the entire transaction, she was nevertheless actively engaged through the agency of her husband in carrying on the business of selling the vacant lots. Petitioners argue, in answer to respondent's joint venture and agency theories, that no agency or joint venture could exist because Loretta was not a party to the agreement except through her husband who was acting as her "trust officer." We understand this to mean that he is alleged to have acted under the agreement only in pursuance of a trust arrangement between Loretta and himself. This record discloses no such trust arrangement. The term "trust officer" as used by petitioners is a mere label unilaterally applied to himself by petitioner husband. We think what he did in behalf of Loretta, both in executing the agreement and in selling the lots in pursuance thereof, *46 were the acts of her agent. His acts therefore are attributable to her as principal. See , affd. (C.A. 6); , affd. (C.A. 3); . Samuel, petitioner husband, was without doubt engaged in the carrying on of a real estate business during the years at issue in his own behalf and as agent for Loretta. During that time he personally sold to his controlled corporation, Building Company, over 90 percent of all the vacant lots reacquired from the State of Michigan covered by the Knowles-Broughton and Knowles-Van Alstyne agreements. He also acquired vacant lots for his own account which he sold in the same manner as those sold for Knowles and Van Alstyne. A comparison of his gross receipts from all sources for 1954 and 1955 discloses that his income has been derived largely from his real estate sales activities. Both petitioners invested money in order that Knowles might reacquire the lots here at issue. It seems reasonable to conclude that Loretta did not lend her money to the project for no evidence *47 of a loan by her appears of record and Knowles was not looked to by her for repayment or for a profit on such advancements. Both she and Samuel looked only to the sale of lots for recovery of moneys advanced and to no other source, and the clear motive for Loretta's advancement and Samuel's purchase of lots was one of profit. Profit, of course, could only result from sales. In the absence of evidence by petitioners to the contrary, it appears to us from the comparative earnings of Samuel that by far the majority of his daily working hours were spent during 1954 and 1955 in selling or attempting to sell the lots in question. We are strengthened in this by his contention that significant amounts of money were expended by him in frequenting golf clubs and a yacht club for the alleged purpose of contacting prospective lot purchasers. We gather from his testimony in this regard that he was primarily known as one who was engaged in the real estate business. Petitioners, as we understand them, seem to rely on the fact that Samuel's sales efforts were with respect to the sales of Building Company whereby it purveyed to prospective customers a "package" consisting of any lot in any subdivision, *48 referred to in our findings, together with a house to be constructed thereon by Building Company; that the customers were Building Company's; and that petitioners had only one customer which was Building Company itself. This contention we think falls because of the weight of substance over form. Clearly, Building Company, even though a real taxable entity, was a mere business tool whereby the joint venturers, Knowles, Samuel, and Loretta, made their stock in trade (the vacant lots) more attractive for sales purposes. They, not Building Company, held the lots for sale to customers as surely as though the company had not existed. There was no real business purpose or necessity for title being held by Building Company during the time of construction of a house for a purchaser. At least none is shown by this record. The Knowles-Broughton and Knowles-Van Alstyne agreements both clearly contemplate that all lots covered thereby were to be immediately offered by the parties for sale to the general public. This seems to us inconsistent with petitioners' investment theory. Apparently no effort was ever made to dispose of the lots as a whole, but rather the only method of sale in the minds *49 of the parties to the two joint venture contracts was clearly that of so amending the existing plats wherein they were located so that they could be sold as single parcels. The record is not clear whether the lots acquired by Samuel and held by him to provide an educational fund for his children were sold with others acquired by him. In the absence of clear proof that they were not sold in the years at issue and the burden being upon petitioners with respect thereto, we hold they were sold during the years at issue as customers chose them. Any profits derived from such sales are taxable to Samuel and not the children for there is no proof here of a trust relationship in existence between them, and the provision of an educational fund for the children is plainly for the personal convenience of petitioners. We find that all the lots covered by the Knowles-Broughton and Knowles-Van Alstyne agreements which were sold during 1954 and 1955 were held by Knowles, Samuel, and Loretta during those years for sale to customers in the carrying on of their real estate business as joint venturers. Issue 2 In their Federal income tax returns for the taxable years 1954 and 1955 petitioners *50 Samuel S. and Loretta T. Broughton claimed business promotion and entertainment expenses in the amounts of $2,530.98 and $2,057.99, respectively. In their 1955 return they also claimed a traveling and convention expense deduction in the amount of $750. In the statutory notice of deficiency respondent disallowed $1,930.98 of the promotion and entertainment expense deduction claimed in the 1954 return, $1,657.99 of the promotion and entertainment expense deduction claimed in the 1955 return, and $375 of the traveling and convention expense deduction claimed in the 1955 return. To prevail on this issue necessitates a showing by petitioners that the claimed amounts were actually spent and that the expenditures were proximately related to the carrying on of petitioners' business. This they have failed to do with respect to any amounts in excess of those allowed as business expense by respondent. We conclude from the absence from the record of any evidence that Samuel kept a record of his claimed business expenditures for promotion, entertainment, and convention expense that no such records were kept. His testimony with respect thereto is so vague, general, and inconclusive as to afford *51 us no opportunity to determine with any degree of finality how much of such expenditure bore a proximate relationship to petitioners' business. The very nature of the expenditures of golf and yachting clubs requires close scrutiny in order that those portions thereof which were related to Samuel's personal pleasure and relaxation be segregated from those portions which related solely to his business. From Samuel's testimony bearing upon the first issue herein, it is reasonable to conclude that very little if any business effect resulted from any such expenditures for that testimony clearly indicates that sales of lots were made primarily as a result of newspaper advertising and the "roofs" of houses already under construction in the subdivisions here involved. There is no evidence before us that any lots were actually sold as a result of Samuel's golf and yacht club expenditures. We have no doubt that a portion of the claimed business expense deductions for both years at issue were actually paid and bore a proximate relationship to petitioners' business of selling vacant lots, but in the absence of evidence sufficient to establish the amount thereof, it is necessary to apply the *52 principle of (C.A. 2). Respondent has applied that principle in his deficiency notice and petitioners have failed to show that any greater amounts than those there allowed constitute deductible business expense. Decision will be entered for the respondent. Footnotes
*. Undetermined.↩